IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

TINA GARRISON,                    )
                                  )
            Plaintiff,            )
                                  )
        v.                        )    Case No.
                                  )    04-4268-CV-C-REL-SSA
JO ANNE BARNHART, Commissioner    )
of Social Security,               )
                                  )
            Defendant.            )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Tina Garrison seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for a period of disability and disability insurance benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ improperly determined plaintiff's residual functional capacity. I find that the ALJ properly discounted the opinion of Dr. Kitto as it was inconsistent with the other records and plaintiff's prior work history, and that the ALJ properly relied on the findings of Dr. Altomari in determining plaintiff's mental residual functional capacity. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On January 29, 2003, plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since February 1, 1997. Plaintiff's disability stems from anxiety, fear around others, being a slow learner, and left arm pain. Plaintiff's application was denied. On March 23, 2004, a hearing was held before an Administrative Law Judge. On June 21, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 10, 2004, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is

Case 2:04-cv-04268-REL   Document 14   Filed 08/22/05   Page 2 of 43

supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.   *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Gary Weimholdt, in addition to documentary evidence admitted at the hearing.

### A.    *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

5

***Earnings Record***

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1987 | $    88.78 | 1996 | $ 3,675.24 |
| 1988 | 1,014.31 | 1997 | 591.25 |
| 1989 | 1,165.78 | 1998 | 0.00 |
| 1990 | 4,200.32 | 1999 | 704.48 |
| 1991 | 3,791.59 | 2000 | 0.00 |
| 1992 | 6,667.55 | 2001 | 1,287.39 |
| 1993 | 1,227.47 | 2002 | 1,254.32 |
| 1994 | 8,093.89 | 2003 | 0.00 |
| 1995 | 5,197.40 | 2004 | 0.00 |

(Tr. at 40).

***Disability Report***

On February 13, 2003, plaintiff completed a Disability Report (Tr. at 41-47). In that report, plaintiff stated that her illnesses include being a slow learner and having a bad left arm (Tr. at 41). Her conditions first began bothering her on October 1, 1970[1] (Tr. at 41). Plaintiff did work after her alleged onset date, and her condition did not cause her to work fewer hours or to change her job duties (Tr. at 42). When asked how plaintiff made job-related changes, plaintiff wrote, "I've never been able to

---

[1]Plaintiff was born on October 5, 1970 – five days after she alleges her impairments began bothering her.

6

work very much due to my conditions." (Tr. at 42).

Plaintiff reported that she worked as a certified nurse assistant from 1989 until 2001 (Tr. at 42). She worked eight hours per day, five days per week, earning $6.25 per hour (Tr. at 42). Plaintiff worked as a poultry de-boner from 1996 until 1997, working 40 hours per week earning $7.00 per hour (Tr. at 42). Plaintiff has a 12th grade education but was in special education classes (Tr. at 45). She graduated in 1989 (Tr. at 45). Plaintiff received her certified nurse assistant license in July 1990 (Tr. at 46).

Plaintiff was taking no medications for her condition (Tr. at 45).

### Disability Report - Field Office

On February 18, 2003, Jason Brown from SSA completed a Disability Report (Tr. at 48-50). Mr. Brown spoke with plaintiff on the telephone and noted that she had no trouble with talking, answering, understanding, concentrating, or coherency (Tr. at 49-50). He noted that she was a bit slow in answering questions but was otherwise polite (Tr. at 50).

### Third Party Daily Activities Questionnaire

On February 27, 2003, Roger Templemeir, plaintiff's boy friend of 2 1/2 years, completed a Daily Activities Questionnaire (Tr. at 67). Mr. Templemeir reported that

7

plaintiff has a negative attitude, she gets stressed over little things like housework, and she has an attitude toward people who have skills she does not have (Tr. at 67).

***Claimant Questionnaire***

On February 27, 2003, plaintiff completed a Claimant Questionnaire (Tr. at 68-71). In the questionnaire plaintiff stated that she gets upset easily when she cannot do things, and she has these "symptoms" all the time (Tr. at 68). Plaintiff does not do anything to relieve her symptoms (Tr. at 68). Plaintiff lives with her boy friend (Tr. at 69).

When asked how her impairment has affected her daily activities, plaintiff wrote, "I was never able to do anything." (Tr. at 69). Plaintiff's impairment has not affected her ability to care for herself (Tr. at 69). She makes microwave dinners, she washes dishes, and she does laundry (Tr. at 69). She does not like to shop (Tr. at 69).

Plaintiff goes out about twice a week (Tr. at 70). She rides her bike when she goes out as she does not have a driver's license (Tr. at 70). Plaintiff usually spends about an hour and a half at her brother's house when she goes out (Tr. at 70).

8

***Report of Contact***

Plaintiff was contacted on May 9, 2003, by SSA to find out more about her daily activities (Tr. at 78-79). Plaintiff reported that her boy friend works and when he comes home he is tired so they don't do much (Tr. at 78). Plaintiff had three children, ages 14, 12, and 10 at the time (Tr. at 78). Those children live with their grandmother in Marshall and she goes to see them when possible (Tr. at 78). Plaintiff reported that she "gets to go about one time a month 'if she's lucky' because her boyfriend has to drive her to go see them."

Plaintiff reported that she does not have a driver's license and does not plan to get one because she has no car (Tr. at 78). Her boy friend has a car but he takes it to work so she would not be able to go anywhere anyway (Tr. at 78). Plaintiff shops for groceries and did Christmas shopping, but with a limited amount of money she does not do a lot of shopping (Tr. at 78). Plaintiff makes microwaveable dinners and uses paper plates so she does not have to clean up much (Tr. at 78-79).

Plaintiff rides her bike to a park up to twice per week (Tr. at 79). She reported that she did not grow up in

9

Sedalia where she lives, so she does not know very many
people there (Tr. at 79).

***Letter to Disability Determinations***

On May 23, 2003, Colleen Pollitt, M.S., from Concordia
Counseling, sent a letter to Disability Determinations (Tr.
at 106). That letter states in part as follows: "I began
to see Tina Garrison in August 2001. I had an authorization
to work with her in individual therapy with a focus on
parenting skills in March of 2001, but contact was not made
until much later. I completed my work with Tina on December
27, 2001."

**B.    *SUMMARY OF MEDICAL RECORDS***

On May 1, 2001, plaintiff was seen at Pathways
Community Behavioral Healthcare, Inc., for CSTAR treatment
plan (Tr. at 91-92). Her diagnosis was alcohol dependence,
GAF 60. A GAF of 51 to 60 indicates moderate symptoms
(e.g., flat affect and circumstantial speech, occasional
panic attacks) or moderate difficulty in social, occupation,
or school functioning (e.g., few friends, conflicts with
peers or co-workers). Plaintiff and her counselor developed
a treatment plan with goals to remain alcohol and drug free.

On May 8, 2001, plaintiff met with her counselor at the
Pathways office (Tr. at 88-89). Plaintiff reported she had

10

not had a drink since February 6, 2001. She was sent to treatment by DFS in order to regain custody of her children. The counselor instructed plaintiff to identify one benefit of her sobriety per week for one month.

On May 10, 2001, plaintiff was seen by James Schroder, M.S., a licensed psychologist at Pathways (Tr. at 93). Plaintiff was diagnosed was alcohol dependence, GAF scores for past year 61, current 60. A GAF score of 61 means mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

On June 4, 2001, plaintiff met with her counselor at the Pathways office (Tr. at 86-87, 90). The counselor participated in team review and instructed plaintiff to write her own personalized aftercare plan. "This writer met with Tina and we discussed her missing so many appointments for IC sessions."

On June 6, 2001, plaintiff was examined by Tim Vuagniaux, M.S., a licensed psychological health services provider (Tr. at 94-105). Relevant portions of Mr. Vuagniaux's report are as follows:

11

REASON FOR REFERRAL:
. . . [S]he had an alcohol problem but was in denial.
Her three sons were placed in DFS custody in February
2001. This was influenced by eighteen hotline reports
received by DFS, mostly related to allegations of lack
of supervision by Tina. In addition, Tina's sons have
records of inappropriate behavior through the Pettis
County Juvenile Office due to the incidences of
vandalizing property, breaking into houses, and
stealing. The boys have been found on numerous
occasions wandering the Sedalia streets either looking
for their mother or entertaining themselves. . . .
Additional supportive accounts were given in the record
related to Tina leaving her boys unsupervised at night
while frequenting bars drinking. Also being negligent
in being able to get her boys up and to school on time
or getting them to school at all on certain days.

. . . Records suggested that Tina was told very
clearly that her children would be removed subsequent
to additional hotline reports. Records indicated that
Tina did not follow through with any of the services
provided. On February 7th another report was received
alleging physical abuse of $M^2$ (age eleven) at the hands
of Tina's boyfriend. This led to DFS taking custody of
Tina's children.

Records indicated that Tina completed an alcohol
assessment at Pathways, which was court ordered,
admitting to having started drinking at age seventeen.
Information suggested though, that Tina was not honest
regarding her current drinking habits, claiming that
she had not drunk alcohol for the last four months,
which conflicted with reports of drinking provided to
Family Services.

Tina and her husband have been divorced for two years,
which has been very difficult for her children. Her
sons are M, age eleven, J, age ten, and T, age eight.
All three are currently placed at [a youth home] in
Mayview, Missouri. Apparently the boys are doing quite

---

[2]The names of plaintiff's children have been changed to
reflect only their initials to protect their privacy.

well at the home.  So far Tina has not requested any
visits with her sons up through the time of 5-11-2001.
She did attend one visit at the DFS office, but claimed
that she had no transportation to the boys' home.  She
requested a visit with the boys' birthdays the first
week of April, then cancelled the visit and did not
reschedule. . . .

Tina has received temporary assistance financially
through Division of Family Services income Maintenance
for 44 months, and in a total lifetime a person can
only receive sixty.  Because she only had 16 more
months left she was made fully aware that she needed to
help herself and take action, but to date she has done
nothing towards getting a job.  At the time of the DFS
report she was supported by her boyfriend, Roger
Templemier, with whom she was living.

. . .  She refused to sign a written service agreement
and has not followed through with visits with her
children.  No contacts have been made by Tina with
Division of Family Services since her children have
been taken. . . .

PSYCHOLOGICAL EVALUATION RESULTS:

Tests and Methods Administered:
     Psychological Interview and History Review
     Observations of Behavior
     The Kaufman Brief intelligence Test (K-BIT)
     The Woodcock-Johnson Psycho-educational
          Achievement Battery (selected subtests)
     The Minnesota Multiphasic Personality Inventory
          (MMPI)

A psychological interview was held with Tina Garrison
at Mefford, Vuagniaux, and Associates on 6-6-2001. . .
.  In the past Tina reported working in a nursing home
in the housekeeping department.  She worked towards and
got certification as a nurse's assistant and worked
until 1998 when her grandmother died.  She has not
worked since that time.

Tina was first married to Scott Garrison from 1990
until being divorced in 1999, although the couple

13

separated in 1994 or 1995 according to her report.  She
also lived with Alvin Norman from 1996 until 2000.

. . .  Her father was an alcoholic and apparently
suffered from emotional problems because of abusive
behavior shown towards Tina's mother. . . .  Further
family history of problems was described by Tina
regarding her own son M.  She described M as a child
out of control who has been extremely oppositional and
defiant.  "I wanted to help him, I wished I could have
helped and hate to admit that he's a problem".  Tina
reported that M was admitted to [a] Mental Hospital
last summer for three weeks and was identified as
having ADHD as well as depression.  He was on the
medication Prozac and Adderall, but apparently came
home and his behavior deteriorated.  Tina admitted
denial and "blocking" of M's problems, which then were
taking place at home as well as at school.  Tina
admitted that she did not follow through in getting
counseling for M other than a consultation with his
psychiatrist for medication.  But Tina admitted, "I
didn't tell the doctor about M having problems." . . .

. . .  She indicated that the children's father had
custody of the children for four of six years.  She
referenced an ongoing custody battle, which ultimately
led to Tina getting the children because the children's
father could not provide for them.  "His mother called
me to pick up the children."  The boys' father lives in
Saline County and does not see the boys much now, and
frequently breaks promises for visits (missed birthday
and Christmas celebrations).  Periodically (every six
months), the boys' father might come and visit
unannounced. . .

Tina was asked about alcohol use.  She reported that
Division of Family Services felt that she had an
alcohol problem, but she stated bluntly "I don't."  She
claimed that she used to drink in the past, but even
then it was not a problem. She claimed that her last
drink was February 6th, and even then she was not
"drunk". . . .  Tina did not describe having any other
psychological symptoms or concerns.

14

. . . In addition to asking her about alcohol use as described above, she was also asked about episodes of her children being unsupervised. Tina denied this allegation flatly, and indicated that when she was out with her friends socially, that her children were fully supervised by either her fiancé, Roger or family members. . .

Tina was asked about allegations that her children had broken into others' property and done other juvenile delinquent acts. Once again, Tina denied all allegations of law enforcement reports. She indicated that her children did not break into any property and that they were not told about this event until four months later, unable to check its authenticity. . . . Further, Tina recalled that she and the boys had been at the pool on the day of the alleged event. . . .

Tina was then asked about M's resistence to going to school regularly. Tina did confirm that this was true, but took no ownership for these concerns either blaming M himself or her ex-husband related to the divorce effects.

Tina was asked about her lack of contact with her children since the children were removed from her home. Tina indicated that she had seen her boys three times, two of which were at the Division of Family Services. . . Tina was also asked about her refusal to get parenting classes as agreed upon in a service written agreement. . . . She made reference to the fact that she did not need such counseling and that she had raised her boys to the best of her knowledge. . . .

Tina was asked if she ever attempted to use rewards or incentives to modify behavior. Tina indicated that she would take the boys to the city park or pool in the summertime and do other activities such as ride bikes for good behavior. . . .

. . . She reported that she had difficulties in school with reading and writing and did require special education classes. . .

Tina . . . indicated that she moved in with her
boyfriend and later husband, Scott Garrison [at age
17].  She soon became pregnant and later gave birth to
M.  She married at age 19, but had M at age eighteen.
After separating from Scott she lived with her
grandmother for a year and then met Alvin Norman where
she lived for four and a half years until 2000.  She
met Roger, her present fiancé, seven months ago. . .

OBSERVATIONS AND BEHAVIOR
Tina came at the designated time for her appointment. .
. . Physically, Tina . . . appeared to have no obvious
physical limitations.  Her mental status appeared
normal.  She was oriented by four times, and showed no
signs of major depression.  Her attention span and
concentration also appeared normal. . .

Tina's immediate and long-term memory appeared adequate
for her age and cognitive level.  She presented a
cooperative attitude and appeared to put her best
effort forward on interview and testing tasks. . .

Personally, Tina was seen to laugh and smile at
different times during the interview and seemed more at
ease as testing continued.  The evaluator sensed that
although Tina was cooperative she could be stubborn as
in her responses to questions regarding her history.
Tina made no mention of hallucinations or delusions or
ever having suicidal ideation.

COGNITIVE AND ACHIEVEMENT TEST RESULTS:
Tina Garrison was administered the Kaufman Brief
Intelligence Test (K-BIT) and the evaluator felt that
Tina's effort was reliable and valid. Tina received a
vocabulary standard score of 85, which fell at the
national percentile rank of 16, which is exactly one
standard deviation below average statistically.  This
falls in the below average range.  Tina scored lower in
visual section matrices, with a standard score of 77,
which fell at the sixth percentile, falling in the well
below average range.  The difference between her
auditory/language vocabulary score and her visually
oriented matrices standard score was not statistically
different.

16

Overall, on the K-BIT, Tina received a K-BIT IQ
composite standard score of 79, which fell at the
national percentile rank of eight, in the well below
average range. This falls into borderline range of
intelligence. . . .

Tina was administered sections of the Woodcock-Johnson
Psycho-Educational Achievement Battery.  Tina received
a reading cluster grade score of 5.8 (fifth grade)
which fell at the tenth grade consistent with a
standard score of 81.  But, Tina's mathematics skills
fell well below that at 4.3 grade score (fourth grade),
falling at the first percentile.  This score was
consistent with a standard score of 65 or below. As can
be seen, Tina's achievement scores fall at or below an
entry level for a middle school aged student.

PERSONALITY EVALUATION RESULTS:
. . . Tina was able to take the Minnesota Multiphasic
Personality Inventory (MMPI). . . Analysis of Tina's
"Welsh Code" is consistent for women who present
themselves as helpless victims and who take little
ownership or responsibility for their problems. . . .

DIAGNOSTIC IMPRESSIONS AND CONCLUSIONS:
. . . Although the Axis I disorder could not be
formally identified except alcohol abuse, the evaluator
did feel that Tina fits Axis II antisocial personality
disorder, because of her failure to conform with lawful
behaviors related to her children, her history of
alcoholism and DWI's, and alleged assaults that took
place in 1998 and 1999 (as reported by Tina).  It is
felt that she has shown a disregard for the safety of
her children based upon DFS's record and a history of
denial, which is correlated with dishonesty. . . .

DIAGNOSTIC IMPRESSIONS:
Axis I:    (Clinical Disorders) Deferred
           305.00 Alcohol Abuse
           Rule out alcohol dependence.
Axis II:  (Personality Disorders and Mental
           Functioning)
           301.7 Antisocial Personality Disorder
           V62.89 Borderline Intellectual Functioning

17

```
Axis III:  (Medical Conditions)
           Bronchial Asthma/Sinus trouble
Axis IV:   (Psychosocial and environmental conditions)
           Current separation from children since
           February 2001/currently attempting to
           reacquire custody, unemployed, in conflict
           with Division of Family Services regarding
           completion of parts of the service agreement
           to reacquire children, limited support from
           immediate family through siblings, ongoing
           difficulties in behavior with oldest child,
           history of conflicts with children's father
           regarding custody issues.
Axis V:    (Global Assessment of Adaptive Functioning)
           Current GAF - Fifty to sixty (estimated)[3]
```

On June 21, 2001, plaintiff met with her counselor at
the Pathways Office (Tr. at 85).  They discussed how
plaintiff's drinking had caused turmoil in her family and
her life.  They discussed plaintiff's depression over not
having visitation with her kids that month because the DFS
case worker was going on vacation.

On August 1, 2001, a Discharge Summary was completed at
Pathways Community Behavioral Healthcare (Tr. at 83-84).
Plaintiff was unsuccessfully discharged due to non-
participation in the treatment program (Tr. at 83-84).  She
had been seeking treatment for relapse prevention.  "Tina
identified benefits of her sobriety and consequences she's
encountered due to her substance abuse; but, Tina never

---

[3]Moderate symptoms

18

achieved her other goals due to non-participation in CSTAR. Attempts by the CSW to re-engage met with negative results." The discharge diagnosis was alcohol dependence, GAF of 60 (moderate symptoms).

On August 30, 2001, plaintiff saw Colleen Pollitt, a counselor at Concord Counseling Services (Tr. at 111-112). The report reads in part as follows:

> Presenting Problem: Tina has three children, M 12 years old in the 6th grade, J 10 years old in the 4th grade, and T 8 years old in the 3rd grade. These children were placed in DFS custody in February 2001 after about 18 hotline reports were received by DFS. They all have records with the Juvenile office for vandalizing property, breaking into houses, and attempting to steal. It was reported they are left unsupervised while she plays Bingo. She is suspected of having an alcohol problem, but she denies and was evaluated by Pathways. She has only a few more months to receive "Temporary Assistance" and should find a job soon.

> Appointments: Tina was authorized for parenting skills training with me in March 15, 2001. She never contacted me. Our office received a phone call on 4/9/01, which said I was to wait until she (Tina) called me. It was reported to me that she was fighting this process. On 7/17/01 . . . I called her and set up an appointment.

> Summary: . . . She has had at least three significant relationships. One marriage and the others were living together. . . .

> Conclusions: I am still not quite sure what to think about Tina. She is very pleasant to talk with and seems to have all the right answers to the right

19

questions.  After reading over the information a second
time I see many inconsistent details between what I am
seeing and what is reported.

Recommendations:
1.    We will continue as scheduled.  I will wait for
      Tina to call and reschedule.  If I don't hear from
      her next week, I will contact her. . . .
3.    There is a lot of work to do to clear up all the
      issues.  I will address the inconsistencies as we
      go along.

On September 25, 2001, Colleen Pollitt at Concord

Counseling Services prepared a progress report (Tr. at 109-

110).  "Tina and Roger have been coming in together.  She

missed the first two appointments of the month because she

had just started a new job and was having a hard time with

the scheduling of appointments and days off. . . .  Tina has

read some of the materials I have given her, but is having

difficulty finding time.  She was to schedule time each day

to read."

On October 30, 2001, Ms. Pollitt prepared a progress

report (Tr. at 108).  "I have met with Tina 5 times in

October. . . .  She is always on time and very receptive to

new ideas.  Tina was very shaken by the news of her oldest

son M and his encounter with his younger brother.  However,

she did not deny there could be a connection to the past

experiences of sexual abuse of M by a friend of hers."

On December 29, 2001, Ms. Pollitt prepared her report for December (Tr. at 107). "I have met with Tina once in December. She cancelled one appointment. . . . The STEP materials have been covered. She is able to discuss the concepts, and voices all the correct answers to the skills training. . . . We have concluded our classes. My only recommendation is that they have some family therapy sessions to work through the reunification issues, especially those concerning M."

There are no records from the end of December 2001 until the consultative evaluation which was done on April 3, 2003, more than 15 months later. On April 3, 2003, plaintiff was evaluated by Gary Kitto, Ph.D., in connection with her application for disability benefits (Tr. at 113-117). Dr. Kitto's report reads in part as follows:

IDENTIFYING DATA

Ms. Tina Garrison is a 33-year-old Caucasian single female who currently resides in Sedalia. . . . She reports that she has been dating someone. . . .

RELEVANT HISTORY

Ms. Tina Garrison is applying for disability because she reports that she has trouble with reading, writing and math abilities and has always had to struggle. Additionally, she states that she broke her left arm twice, once at the age of 7 and one at the age of 12 and apparently it did not heal correctly and she has pain [from] her wrist to shoulder and limited mobility.

21

She states that she feels out of place being around people and she is very fearful and frequently feels "dead inside". She stated that she has been in counseling approximately one year ago with Ms. Colleen Pollitt and Family Services referred her to counseling. She reports that she . . . lost custody of her children because she could not cope with the children. It was apparent that she was somewhat evasive when talking about this. . . . The children were taken due to being unsupervised although during this evaluation she denies that.

. . . She states that she has one sister age 39 and two brothers, a sister, then herself and then a brother who is the youngest. She states that she is close to all of her siblings. . . . She attended school in Marshall and reports that her academic performance was in the normal range. She was always in special education classes while in school. . . .

. . . [M]ost of her jobs involved working in nursing homes. She worked the night shift because she had such an intense fear of people however she did report on one occasion she was fired. . . .

Ms. Garrison has been arrested three times for assault. One was approximately two years ago and the one was when she was a teenager. She states that the assault charges were against women whom she was fighting with over dating relationships. The most recent charge she served 48 hours in jail. She also states that she was arrested for driving with no license and she also has had two DWI's when she was around the age of 21. Again she was somewhat evasive in regards to her drinking. She states that she drank alcohol when she was younger quite heavily but she stopped two or three years ago right after her children were taken away. She stated that in the past she has had a problem of heavy drinking on the weekends but she does not think it is a problem because she does not drink during the week. . . .

22

## MENTAL STATUS SUMMARY

. . . She presented herself for this evaluation on
time. . . She was fairly well groomed. . . . Her
general activity level would be described as being
extremely tense and nervous and her affect would be
described as fearful and anxious. However she at times
appeared to try and cooperate but at other times she
was quite evasive when offering information.

. . . She does appear to be alert and oriented in
three spheres and appears to have a fairly good fund of
general information. Intellectual functioning appears
to be slightly below normal and she does present with
problems with recent and remote memory. She could not
repeat digits forward or in reverse beyond three digits
and could not perform simple mathematical computations.

Ms. Garrison was able to give abstract responses to
similarities however could not do that for simple
proverbs offered to her. I would question her judgment
based on her responses to social situations offered to
her. . . .

Ms. Garrison states that she has trouble sleeping on a
frequent basis and will average 4 to 5 hours per night
because she is a worrier. She does not take any naps
during the day and spends most of her free time
watching television. . . . She does not go to the
doctor for anything because she has a fear of doctors
in addition to her fear of other people. . . . [W]hen
she had custody of her kids she would go roller-
skating. . . . She also states that in the past she
was a regular BINGO player. . . .

## SUMMARY

. . . Ms. Tina Garrison does present with symptoms
that are consistent with an anxiety disorder of
sufficient severity to warrant a diagnosis of Panic
Disorder with Agoraphobia. I do suspect that she does
have some mood disturbance of sufficient severity to
warrant a diagnosis of Depression. . . . I do believe
that Ms. Tina Garrison has intellectual functioning
that is below normal. . . . I would have some concerns

23

at the present time about her participating in daily
activities due to her anxiety levels and although she
does appear to have marked difficulty in social
functioning.  There appears to be problems in her
concentration, which are likely to contribute to
problems in persistence and pace.  There is a history
of repeated episodes of deterioration in her work like
settings.  I would question her ability to manage her
own funds and at the present time at least temporarily
it may be prudent to have a guardian appointed.  I do
believe she can understand and remember simple
instructions but she may have difficulty sustaining
concentration and persistence in any tasks.  She is
likely to interact socially and adapt in her
environment based on her anxiety disorder and not be
particularly very functional.

On May 14, 2003, Mark Altomari, Ph.D., a clinical

psychologist, completed a Mental Residual Functional

Capacity Assessment (Tr. at 118-120).  Dr. Altomari found

that plaintiff is not significantly limited in the

following:

- The ability to remember locations and work-like
  procedures

- The ability to understand and remember very short and
  simple instructions

- The ability to carry out very short and simple
  instructions

- The ability to maintain attention and concentration for
  extended periods

- The ability to perform activities within a schedule,
  maintain regular attendance, and be punctual within
  customary tolerances

- The ability to sustain an ordinary routine without
  special supervision

24

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

25

- The ability to respond appropriately to changes in the work setting

In support of his findings, Dr. Altomari wrote the following: "She has been able to work at SGA [substantial gainful activity] levels. There is no treatment history which would account for the claimant's reported limitations. The claimant did not allege social restrictions at the time of application except to say that she does not like the public. Her allegations are credible, but do not seem markedly limiting. The medical source statement of [Dr. Kitto] is confusing and based on limited contact with the claimant. The claimant's limitations are rated on the basis of her self-report. She does not appear to have ever had a psychological condition which would have prevented her from performing work-like tasks in a competitive environment." (Tr. at 120).

That same day, Dr. Altomari completed a Psychiatric Review Technique (Tr. at 122-135). Dr. Altomari found that plaintiff suffers from organic mental disorders, affective disorders, and anxiety-related disorders (Tr. at 122). The organic mental disorder was from borderline intellectual functioning (Tr. at 123). The affective disorder is from mood disorder not otherwise specified (Tr. at 125). The

26

anxiety-related disorder is from panic disorder with agoraphobia (Tr. at 127).

He found that plaintiff suffers from moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and has had no repeated episodes of decompensation (Tr. at 132). In support, Dr. Altomari wrote in part as follows: "The claimant is able to shop and she rides her bike. She does not socialize much, except with her family. The claimant's allegations are fully credible. She appears to be capable of performing simple repetitive tasks in a relatively isolated work environment." (Tr. at 134).

## C. *SUMMARY OF TESTIMONY*

During the March 23, 2004, hearing, plaintiff testified; and Gary Weimholdt, a vocational expert, testified at the request of the ALJ. Prior to taking testimony, the ALJ stated (in regard to plaintiff's letter requesting IQ testing) that because there was no evidence of mental retardation, he saw no need to test for mental retardation (Tr. at 148).

27

**1. Plaintiff's testimony.**

At the time of the hearing, plaintiff was 33 years of
age (Tr. at 149). She graduated from Marshall High School,
but took special education classes (Tr. at 149). Plaintiff
was able to read the letters sent to her in preparation for
her disability case, and she writes letters to her son (Tr.
at 149-150).

Plaintiff's boy friend pays the bills (Tr. at 150).
She has never had a checkbook, and has never had a driver's
license (Tr. at 150-151).

Plaintiff last worked at a nursing home about a year or
year and a half earlier (Tr. at 151-152). She worked as a
nurse's aide taking care of the patients and making beds
(Tr. at 152). She worked for less than six months at that
job because she got depressed after her kids were taken away
(Tr. at 152). Prior to that job plaintiff worked de-boning
chicken on a production line for eight hours a day four days
per week (Tr. at 153, 154). She stopped doing that job
because her left arm hurt when she was working and she could
not keep up (Tr. at 153-155).

Plaintiff worked at Tyson for a "long time" (Tr. at
155). At Tyson she packaged meat into boxes and weighed
them (Tr. at 155). She worked on a production line at that

28

job too (Tr. at 155).  Plaintiff applied for a job at a grocery store about three months before the administrative hearing, but she was not hired (Tr. at 164).

Plaintiff is scared around people (Tr. at 156).  she does not go out of her house very often because people make her scared and nervous (Tr. at 156).  She has trouble understanding directions, she has trouble sleeping, and she gets stressed over everything (Tr. at 157).  When asked what she does when she is depressed, plaintiff testified, "I deal with it." (Tr. at 158).  Being by herself helps her depression (Tr. at 158).  If plaintiff gets a good night's sleep, she is pretty happy the next day (Tr. at 159).  She spends her days watching television, and she does a puzzle about once a month (Tr. at 159, 165).

When asked about her children being taken away, plaintiff testified that they were removed from her home because she let them play outside and then was told that she was not supervising them (Tr. at 158).  Plaintiff testified that she stopped drinking shortly after her kids were taken away in February 2001 (Tr. at 160).  Plaintiff saw a counselor at Pathways for a while but she stopped going because she did not feel he was helping her and she was nervous around him (Tr. at 161).

Plaintiff's left arm did not heal properly after she broke it the second time, and as a result she experiences pain in her left arm (Tr. at 161-162). Plaintiff estimated she could lift 20 to 25 pounds with her left arm (Tr. at 162).

## 2. **Vocational expert testimony.**

Vocational expert Gary Weimholdt testified at the request of the Administrative Law Judge. He testified that plaintiff's past relevant work as a nurse's aide was semi-skilled with a medium exertional level but can be performed at a greater level of exertion (Tr. at 167). A nurse's aide interacts with people all the time (Tr. at 167). Plaintiff's job as a poultry de-boner is an unskilled job and performed at the light exertional level (Tr. at 167).

The first hypothetical posed to the vocational expert included a person capable of performing simple, routine, repetitive tasks; could sustain that activity during the workday; should not work in jobs requiring more than occasional interaction with coworkers, supervisors, or the public; and can tolerate occasional interaction with others (Tr. at 168). The vocational expert testified that such a person could perform the poultry de-boner position (Tr. at 168).

The second hypothetical assumed the person could have only minimal interaction, i.e., just a few times per day, with coworkers, supervisors, and the public (Tr. at 169). The vocational expert testified that the person could still perform the poultry de-boner position because those people work independently of others (Tr. at 169). "For example, there are many non-English-speaking people working, in those occupations, and there's no communication problem in terms of completing the work." (Tr. at 169).

The third hypothetical assumed the person could not tolerate any interaction at all with people (Tr. at 169). The vocational expert testified that if the hypothetical person could not even tolerate being in the proximity of other workers, the person could not be gainfully employed (Tr. at 169).

The fourth hypothetical assumed an individual who has problems with concentration which would be likely to contribute to problems in persistence and pace; is able to understand and remember simple instructions but may have difficulty sustaining concentration and persistence in any task; is likely to interact socially and adapt in her environment based on her anxiety disorder but not be particularly functional (Tr. at 170). The ALJ clarified the

hypothetical by stating that the person would probably be unable to sustain concentration and persistence on a sustained basis (Tr. at 170-171). The vocational expert testified that there would be no jobs for that person (Tr. at 171).

## V. *FINDINGS OF THE ALJ*

The ALJ first noted that plaintiff previously filed an application for Title II benefits in December 1999 (Tr. at 13). That application was denied in August 2000 and became a final determination (Tr. at 13). The ALJ did not reopen or revise that final decision (Tr. at 13).

Additionally the ALJ noted that during the hearing plaintiff's attorney requested that plaintiff be tested to measure her I.Q. and that the consultative psychological examiner, Gary Kitto, Ph.D., be requested to clarify his opinion (Tr. at 13). The ALJ declined those requests after finding that the record was sufficiently developed (Tr. at 13).

The ALJ found that plaintiff met the nondisability requirements and was insured for disability benefits through September 30, 2001 (Tr. at 14).

Step One. The ALJ found that although plaintiff worked in 2001 and in 2002, those earnings do not meet the level

32

required for substantial gainful activity (Tr. at 15). Therefore, at step one the ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date.

Step Two. The ALJ found that plaintiff has a severe impairment consisting of borderline intellectual functioning, anxiety with agoraphobia, and mood disorder (Tr. at 15). The ALJ found that plaintiff's left arm impairment is not severe (Tr. at 15).

Step Three. The ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step Four. The ALJ determined that plaintiff retains the physical residual functional capacity to perform work at all exertional levels (Tr. at 16). She retains the mental residual functional capacity to perform simple repetitive unskilled work with no more than occasional interaction with coworkers, supervisors, and the public (Tr. at 16). With this residual functional capacity, the ALJ found that plaintiff could perform her past relevant work as a poultry de-boner (Tr. at 19). Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

33

## VI. THE ALJ'S RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff argues that the ALJ erred in relying on the findings of a non-examining, non-treating physician in determining plaintiff's residual functional capacity. She further argues that the ALJ had a duty to further develop the record due to the confusion in Dr. Kitto's report and suggested that Dr. Kitto be contacted to put his findings in a checklist form.

Defendant argues that although Dr. Kitto examined plaintiff and Dr. Altomari did not, neither were treating physicians, Dr. Kitto's findings were not supported by the record, Dr. Altomari's findings were consistent with plaintiff's work history and the findings of Mr. Vuagniaux, a licensed psychological health services provider. Finally, the defendant points out that Dr. Kitto's evaluation occurred long after plaintiff's last insured date which was in September 2001. Dr. Kitto evaluated plaintiff on April 3, 2003, about a month after she applied for disability benefits.

The ALJ had this to say about Dr. Kitto's conclusions:

While the record provides some support for Dr. Kitto's diagnoses, the evidentiary record, including Dr. Kitto's relatively mild or ambivalent examination findings, do not support his assessment of the claimant's mental residual functional capacity. As the

34

claimant acknowledged that she has not received any formal treatment for her allegedly disabling mental conditions, Dr. Kitto's assessment is necessarily based on his single examination of the claimant and her self-reported limitations, which are not supported by any treatment records. Moreover, the evidentiary record does not corroborate the existence of mental limitations as severe as those she reported to Dr. Kitto. The claimant reported that she always attended special education classes and that she applied for disability because of her lifelong difficulties with reading, writing and math. However, she also stated that her academic performance was in the normal range. In addition, the asserted severity of the claimant's lifelong learning difficulties are inconsistent with her work history, which included semi-skilled work as a nurse aide. While the claimant reported that she experiences anxiety around others and that she stopped working in nursing homes because she was afraid of the people, the claimant testified that she applied for work in a grocery store only three months prior to the hearing. The claimant's willingness to apply for such work suggests that she is capable of interpersonal contact necessary to perform a significant range of work. Although the claimant asserted that she has not received treatment for her allegedly disabling mental conditions due to her fear of physicians, she also admitted to receiving voluntary medical treatment in the past. Simply stated, the claimant's lack of mental health treatment and her personal and work history do not support the asserted severity of her mental functional limitations. Accordingly, the undersigned agrees with the State Agency consulting psychologist's [Dr. Altomari] conclusion that Dr. Kitto's mental capacity assessment is not supported by the evidentiary record.

(Tr. at 17).

Plaintiff points out three inconsistencies relied on by the ALJ to discount the opinion of Dr. Kitto: (1) the asserted severity of plaintiff's life-long learning

35

difficulties are inconsistent with her work history, (2)
plaintiff did not receive treatment for her mental
conditions, and (3) plaintiff applied to work in a grocery
store three months before the administrative hearing.
Plaintiff takes exception with all three reasons.

### *Plaintiff's ability to learn*

Plaintiff first challenges the ALJ's finding that the
asserted severity of plaintiff's life-long learning
difficulties are inconsistent with her work history.  I find
that the record supports the ALJ's finding.

Plaintiff stated in her Disability Report that she
received a certified nurse assistance license in July 1990.
Clearly plaintiff had the ability to learn well enough to
obtain that license.  The vocational expert testified that
work as a nurse's aide is semi-skilled and therefore
requires some ability to learn.  On February 18, 2003, Jason
Brown observed that plaintiff had no trouble with
understanding, concentrating, or with coherency.  On June 6,
2001, Tim Vuagniaux noted that plaintiff's attention span,
concentration, immediate memory, long-term memory, and
cognitive level were all normal.  On August 30, 2001,
Colleen Pollitt, plaintiff's counselor, remarked that
plaintiff seemed to have all the right answers to all the

36

right questions. In September 2001, it was noted that plaintiff had read some of the materials provided to her by Concord Counseling Services, but she was having difficulty finding time to read it all. Plaintiff never alleged that she had difficulty reading or understanding the material, only that she was having trouble finding the time. In December 2001, Ms. Pollitt remarked that plaintiff was able to discuss the concepts and came up with all the correct answers to the skills training.

The entire record, therefore, with the exception of plaintiff's subjective allegations after she filed her disability application and the findings of Dr. Kitto, which were based on plaintiff's allegations, support the ALJ's finding that plaintiff has the ability to learn.

In June 2001, Mr. Vuagniaux noted that plaintiff had been receiving financial assistance from DFS for 44 months and in a lifetime a person can only receive benefits for 60 months. Coincidentally, plaintiff's 60 months appears to have expired in January 2003 – the very month plaintiff applied for Social Security disability benefits. In addition, shortly after she applied for benefits, she saw Dr. Kitto for a consultative evaluation, and it was during that evaluation that plaintiff "displayed" the most serious

37

mental impairment reflected anywhere in the record, including the only instance of a difficulty concentrating and remembering.

I also note that plaintiff said she quit working in 1998 because her grandmother died. She then filed her first application for disability benefits in the following calendar year. Between the time plaintiff quit work due to her grandmother's death and the final denial of her social security disability application in late 2000, plaintiff earned only $704. After the denial of plaintiff's disability application, plaintiff subsisted on DFS financial assistance which was set to expire in approximately January 2003, the month she filed her second Social Security disability application. All of this establishes a strong motive on plaintiff's part to convince Dr. Kitto that she was suffering from a disability. It also significantly weakens Dr. Kitto's findings, especially since there is no evidence that he conducted any tests beyond asking plaintiff to explain proverbs or remembering numbers.

***Plaintiff's lack of treatment for her mental condition***.

Plaintiff next challenges the ALJ's reliance on the fact that plaintiff sought no treatment for her allegedly disabling mental condition. Again, I find that the record

38

supports the ALJ's reliance on this factor.

Plaintiff argued that she did not seek mental health treatment because she was very afraid of doctors. The record establishes that plaintiff was able to meet with Mr. Vuagniaux at his office in June 2001. She was there due to her kids being taken away and to work on her alcoholism. Mr. Vuagniaux noted that plaintiff "did not describe having any other psychological symptoms or concerns." Mr. Vuagniaux found plaintiff's mental status normal. She showed no signs of major depression, her attention span was normal, and her concentration was normal. Her short-term and long-term memory were normal, and her cognitive level was adequate. Plaintiff was observed to laugh and smile during her interview with Mr. Vuagniaux.

Plaintiff never alleged a fear of doctors until she met with Dr. Kitto in connectin with her application for disability benefits.

Plaintiff claimed to be depressed over not being able to see her kids; however, the record is full of comments about plaintiff not taking advantage of opportunities to visit her kids, including her canceling a birthday visit with them and failing to reschedule.

39

There simply is very little evidence of depression or a
disabling mental impairment. There is no evidence that
plaintiff was unable to see doctors or counselors. In fact,
the record establishes that plaintiff was seeing a counselor
at Pathways due to her alcohol abuse and at the direction of
DFS. Her last visit at Pathways was June 21, 2001. In
August, she was discharged for failing to participate.
Contrary to her assertion that she is nervous around
"doctors", it appears that plaintiff's failure to continue
at Pathways occurred at the same time she began counseling
with Colleen Pollitt at Concord Counseling Services, again
at the direction of DFS. Plaintiff was directed to make an
appointment with Ms. Pollitt in March after plaintiff's
children were removed from her home. She never called, and
it was noted that she was resistant to such treatment
because she felt she was parenting just fine. On July 17,
2001, Ms. Pollitt called plaintiff and set up the counseling
sessions. That occurred the same time plaintiff stopped
attending her sessions at Pathways. Both counselors noted
that plaintiff was resistant to the treatment because she
did not believe she had a problem with alcohol or with her
parenting skills. No one ever concluded that plaintiff had
a problem with "doctors" or other healthcare professionals.

40

The record clearly establishes that plaintiff's failure to obtain treatment for her mental health condition was not due to her intense fear of doctors, but rather her belief that she did not need any mental health treatment.

***Plaintiff's application to work in a grocery store***

The ALJ relied partly on the fact that plaintiff applied to work in a grocery store three months before the administrative hearing in support of his finding that plaintiff can tolerate occasional contact with co-workers, supervisors, or the public. Again, plaintiff challenges this reliance. I find that the record clearly supports the ALJ's reliance on this fact and supports the ALJ's finding that plaintiff can tolerate enough social contact to work as a poultry de-boner.

The record is full of instances when plaintiff socialized or deliberately placed herself in public places voluntarily.

DFS records indicate that plaintiff left her children unsupervised at night while she was frequenting bars. She had enough social contact to become romantically involved with at least three men, and she had physical fights with other women over boy friends. Plaintiff told Mr. Vuagniaux in June 2001 that whenever she "goes out with her friends

socially" her children are supervised by either her fiancé
or other family members.  Plaintiff said she took her kids
to the pool, she took her kids to the city park, she took
her kids roller-skating, and she rode bikes with her kids.
Plaintiff reported on several occasions that she played
Bingo.  Plaintiff was able to visit with her kids at the DFS
offices and was able to be around other people when she
attended counseling at Pathways and at Concordia Counseling.
Ms. Pollitt noted that plaintiff was "very pleasant to talk
with".  Plaintiff told no one other than Dr. Kitto that she
has an "intense fear of people", and the record establishes
that she never displayed such an intense fear other than
while being evaluated by Dr. Kitto.

      In addition, plaintiff told an SSA representative on
May 9, 2003, that she and her boy friend do not go out
because when he comes home from work he is tired.  She said
she does not have a driver's license and had no plans to get
one because her boy friend took the car to work so she was
unable to go anywhere anyway.  She said she does shop for
groceries and does Christmas shopping, but because she has
only a limited amount of money she does not do a lot of
shopping.  Plaintiff's reasons for spending so much time at
home were reasons other than an intense fear people.

                              42

## *Conclusion*

Based on all of the above, I find that the ALJ did not err in discounting the opinion of Dr. Kitto and relying on the opinion of Dr. Altomari in forming his conclusion about what plaintiff is mentally capable of doing.

## VII. CONCLUSIONS

I find that the ALJ's mental residual functional capacity assessment and his finding that plaintiff can perform her past relevant work as a poultry de-boner are supported by substantial evidence in the record as a whole. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 19, 2005

43